233 N.W.2d 760 (1975)
COLUMBIA HEIGHTS POLICE RELIEF ASSOCIATION, et al., Respondents,
v.
CITY OF COLUMBIA HEIGHTS, Appellant.
No. 45050.
Supreme Court of Minnesota.
September 26, 1975.
*761 Smith, Juster, Feikema, Haskvitz & Casserly and Ronald L. Haskvitz, Peterson & Kalina and Ronald S. Kalina, Minneapolis, for appellant.
Warren Spannaus, Atty. Gen., Peter W. Sipkins, Sol. Gen., Merwin W. Peterson, Asst. Atty. Gen., St. Paul, for respondent PERA.
Barna, Guzy, Hynes, Giancola & Jensen, Minneapolis, for respondent Columbia Heights Police Relief Assn.
Heard before ROGOSHESKE, PETERSON, and KELLY, JJ., and considered and decided by the court en banc.
ROGOSHESKE, Justice.
Appeal by the city of Columbia Heights from a judgment declaring invalid a charter amendment enacted by the city council by ordinance requiring all police officers hired after June 15, 1972, to become members of the Public Employees Retirement Association Police and Fire Fund (PERA) and prohibiting their membership in the Columbia Heights Police Relief Association (CHPRA).
CHPRA filed a petition for a writ of mandamus ordering the city to recognize CHPRA as the sole pension plan available to its police officers and further ordering it to comply with the association's bylaws, rules, and regulations. The city counterclaimed, seeking a declaratory judgment determining that the city was authorized by the constitution and laws of the state to adopt the charter amendment. PERA was joined as a party petitioner on motion of the city. After trial upon stipulated facts, the court issued abbreviated findings and concluded that "[u]nder the general law applicable to police relief associations" all police officers hired by the city are required to be members of CHPRA and are not "eligible" for membership in PERA, and that the charter amendment and enacting ordinance "adopted by [the city] are not authorized under the constitution and laws of the State of Minnesota and are void."
The critical issue which all parties seek reviewed is the trial court's presumed determination that the charter amendment conflicts with statutory provisions governing required membership in local police associations of cities of the third class, as well as with statutes governing eligibility for membership in PERA, and is therefore contrary *762 to the public policy of the state and is beyond a chartered city's authority to enact. We disagree with the trial court's decision on this issue even though we feel compelled, for reasons later explained, to remand for decision by the trial court on the issue of whether the enactment of the charter amendment by ordinance complied with statutory procedural requirements.
As to the essential facts, it was stipulated the CHPRA was organized and incorporated in 1957 pursuant to Minn.St. 423.37 authorizing police officers of the city of the third class to incorporate policemen's relief associations for the purpose of establishing a police pension fund to pay retirement and disability benefits.[1] The city, then statutorily classified as a third class city, as invited and permitted by § 423.392, elected by resolution to be bound by the statutory provisions governing such association.[2] On June 4, 1965, due to an increase in population, the city's classification changed to that of a second class city. As disclosed upon oral argument, the city became aware of its unfunded accrued liability for pension benefits of its 13-member police force, and motivated by a growing concern for the future financial problems of the police pension fund under CHPRA, the city's charter commission in February 1972 recommended adoption of the challenged charter amendment. Thereafter, on March 13, 1972, the city council, in claimed good-faith compliance with Minn.St.1971, § 410.31, subd. 2, authorizing charter amendments by ordinance, amended its charter by unanimously adopting the following ordinance designated Ordinance No. 781:
"Section 1. The Charter of the City of Columbia Heights is amended by adding Section 10a to read as follows:
"`Section 10a. Notwithstanding the provisions of any general or special law or this charter, all police first employed by the City on and after June 15, 1972 shall be members of the Public Employees Retirement Association Police and Fire Fund, and shall not be eligible for membership in the Columbia Heights Police Relief Association.'
"Section 2. This ordinance is enacted pursuant to Minnesota Statutes, Section 410.31, and shall take effect and be in force 90 days after passage and publication."
Two police officers were subsequently hired by the city, one on June 15, 1972, and the other on September 6, 1972. Pension benefits for these officers were provided in accordance with the charter amendment, and the city's share of contributions for such benefits was made to PERA. The latter, after receipt of such contributions, returned them to the city upon a ruling by the attorney general on November 28, 1972, that such new officers could not be members of the police and fire fund of PERA. The attorney general's ruling was based upon his opinion that the charter amendment is inconsistent with and repugnant to Minn.St. 423.373 and 353.64, subd. 1, and that special legislation, such as enacted for the city of Mankato,[3] was necessary to render *763 newly hired police officers of Columbia Heights eligible for membership in PERA. These proceedings, commenced in September 1973, followed.
1. In addressing the merits of the critical issue, a reference to the historical background of such pension funds will contribute to the understanding of our resolution. There are two types of tax-supported pension systems for municipal police officers of Minnesota, statewide and local. The earlier retirement age and reduced service requirements common to both are in recognition of a police officer's hazardous duty and the physical demands upon him. The statewide system, established in 1959, affords coverage under the PERA Police and Fire Fund. The local system was created under general laws, which mandated or otherwise authorized policemen of various classes of cities to incorporate police relief associations. These associations, numbering over 30, afford coverage to the largest number of municipal police officers and operate under a combination of general laws; over 200 special laws which modify, nullify, or clarify the general laws; many noncoded laws of ancient vintage; and articles of incorporation and bylaws formulated and adopted by the members of each association. Typically, the local systems, in accordance with the police association's articles and bylaws and subject to statutory maximums, provide pension benefits at age 50 after 20 years of service of one-half of the salary allotted to the rank the officer attained at retirement. Under PERA, at age 55 after 20 years of service, benefits are one-half of the average of the highest salary earned for 5 successive years of service with no automatic escalation of benefits after retirement but with features of vesting and lateral movement upon employment change. Financing of both systems consists of contributions to the pension fund by the police officers, municipal tax levies, and state aid equivalent to what the municipality receives from the state's 2-percent tax on fire insurance premiums. Currently, 13 cities operate their pension funds under general laws covering third class cities. Pursuant to § 423.392,[4] five of these, including Columbia Heights, elected to be bound by the general laws creating the relief associations when third class cities, and they are now second class cities.[5] Unlike second class cities, which are mandated to establish police relief associations, §§ 423.801 to 423.815, the discretionary authority of a third class city to elect to be bound was continued despite a city's change in status to a second class city by force of the language of § 423.392, that "such city may thereafter continue to be bound by it notwithstanding a subsequent change in the classification of the city," and by Minn.St.1974, § 69.79. Section 69.79, enacted in 1969, precluded application "by operation of law" of the statutes governing second class cities to former third class cities.
This brief historical background and the legislature's, as well as the municipalities', intense concern and vexation over complex problems of financing local pension funds in all classes of cities is revealed in a series of reports by interim legislative study commissions beginning in 1957. These reports have had more meaningful impact after *764 actuarial valuations were mandated in 1964, 1967, and 1970.[6]
We are persuaded that neither the general statutory provisions relating to the creation and maintenance of local police pension systems in third class cities nor those governing eligibility for membership in PERA Police and Fire Fund preclude the city from adopting the challenged charter amendment. The answer to the critical issue turns on whether the charter amendment is in conflict with or contravenes a discernible state policy embodied in statutes applicable to the police pension systems of third class cities.
While the parties urge conflicting application of Minn.St.1974, § 69.79,[7] we construe it as merely intended to prevent an established pension plan from automatic change as a result of a change in population classification. Its effect on Columbia Heights was no more than to continue the validity of the city's election to be bound by the general laws governing a third class city's obligation to its police relief association and to protect the association's existing members from abandonment despite the city's change in classification.
Our study of the applicable statutes reveals no irreconcilable conflict with the charter amendment. The provisions urged by PERA and CHPRA as conflicting are Minn.St. 423.373,[8] which requires that every policeman of a third class city "shall automatically become a member" and therefore contribute to the established relief association, and § 353.64, subd. 1,[9] which excludes from membership in PERA every police officer who is "required to contribute to any other pension, relief, or retirement *765 fund."[10] When considered standing alone, these provisions appear to support the argument that the charter amendment's elimination of the requirement that newly hired officers become members of CHPRA and the requirement of membership in PERA are in direct conflict with the statutory provisions. However, the historical background, together with the purpose and objective of the relevant statutory scheme to provide retirement benefits to public employees, must be considered in order to determine legislative intent.[11] It must also be borne in mind that the issue is not a police officer's right or obligation to be a member of a local or state pension system but the authority of the city to change the pension plan for newly hired police officers by eliminating CHPRA's statutorily authorized requirement of automatic membership. In our opinion, the most significant statute, relied upon by the city and not cited in the attorney general's ruling, is § 423.392.[12] This provision, peculiar to police relief associations incorporated and governed by the general laws relating to third class cities, was first enacted by L.1947, c. 625. Before that, a third class city's police relief association could not be established without the prior consent of the governing council. L.1943, c. 521.[13] When CHPRA was incorporated in 1957, the city was not required to give its prior consent, and under Minn.St.423.392 it was vested with a discretionary choice to be bound by the statutes governing its operation and maintenance. The city's election to be bound obligated it to contribute public funds to the pension fund raised by annual tax levies (§ 423.376), to make and turn over to the fund deductions from the salaries of active officers (§ 423.377), and to become subject to the association's articles of incorporation and bylaws establishing the amount of salary deduction, retirement, and disability benefits, which the association's officers, board of directors, and members were vested with authority to determine subject only to statutory limitations. Had the city chosen not to be bound by §§ 423.37 to 423.391, doubtless the benefits now afforded by CHPRA could not have been achieved, no salary contribution other than dues would have been required, and the only retirement benefits its member officers could have secured were afforded by PERA, which at that time were common to all nonexcluded public employees and which only after 1959 gave increased benefits to policemen through the police and fire fund.
All this, we believe, supports our conclusion that third class city relief associations were statutorily designed to be independent entities with perpetual existence to afford officers who became members such benefits as association funds permitted, and that § 423.373, requiring automatic membership, was therefore not intended to limit the discretionary authority of the governing council of a third class city to be or not to be bound.
The question of whether the city's initial election to be bound was intended to be irrevocable as to newly hired officers requires answer. Section 423.392 contains no language expressly or impliedly so declaring. Unlike language found in § 423.22 relating to certain fourth class cities' elections to come under provisions governing *766 their police relief association, which provides after election that the city "shall continue thereunder notwithstanding any subsequent change in classification or valuation," § 423.392 has declared since 1951 that a third class city, once having elected to be bound, "may thereafter continue to be bound by [its prior election] notwithstanding a subsequent change in the classification of the city." Further, unlike Minn.St. 1974, § 69.79, which precluded an automatic change in pension plan upon a change in population, Minn.St. 423.392 speaks to the third class city's authority upon a change in classification. To have meaning, the condition of a "change in classification" must be interpreted as speaking to the future authority of the city to change its police pension obligations. While the "perpetual existence" character of CHPRA and fundamental principles of contract law would preclude the city from abandoning its obligation to officers who had previously become its members (and such intention is disavowed by the city), the language must be construed as at least authorizing the city to place its newly hired officers under another available pension plan rather than to continue requiring membership in CHPRA, whose pension fund at oral argument had an accrued unfunded liability approaching $1 million.
Nor does the charter amendment conflict with the eligibility requirements of PERA or contravene any state policy governing its operation. Rather, contrary to the city's argument, if we assume, as we do, that all public employees' pensions, including those of municipal police officers, are not matters of purely local concern but are of statewide concern in a now developing legislative objective, as repeatedly expressed in its interim study reports, to achieve statewide uniformity of benefits under fully funded pension plans, the charter amendment can in no way be regarded as inconsistent with state policy.
PERA, established in 1931 with voluntary membership until 1951, is now the largest pension fund in the state. Generally speaking, it provides pension coverage for all local public employees except those who are required to contribute to any other pension system. § 353.01, subd. 2b(j).[14] As noted earlier, before 1959 there was no statewide pension fund for municipal police officers, and all who were not members of the local relief association were afforded coverage under the regular PERA fund. After the police and fire fund was established as a division of PERA, § 353.64, subd. 1, as amended in 1961,[15] broadened PERA eligibility by excluding from eligibility only those police officers who prior to July 1, 1961, were members of and required to contribute to local relief associations. When the statutes governing eligibility for PERA are considered in their historical context, we find their intent was not to freeze membership of police officers in local associations but to prevent double pension benefits from both systems and, more indirectly, to discourage after 1961 the establishment of new local relief associations. The latter objective has now been fully accomplished by the enactment of L.1975, c. 405.[16]
Accordingly, we conclude and hold that the charter amendment does not conflict with the provisions governing membership in CHPRA, the eligibility requirements for membership of PERA, or with the legislatively declared policy respecting municipal police pensions. Despite the asserted intention of the city's present council, the good faith of which is unquestioned, to fully protect present members, we share the concern of CHPRA as to the city's continuing ability and willingness under future governance to adequately fund its pension fund by compliance with the 1969 guideline act[17] to ensure payment of benefits to association members. On this record, however, we have no basis to evaluate the consequences *767 of our decision permitting, in effect, the phasing out of CHPRA. We can only note that the problem is a legislative one and, as indicated by the legislative study commission's recent reports, common to all ongoing local police and fire fighter pension funds. If we have misconstrued the intent of the legislature with respect to cities governed by the same general pension laws as this city, the legislature appears well informed concerning the problem and fully authorized to amend the relevant statutes or to declare preemption.
2. CHPRA argues that the charter amendment enacted by ordinance is invalid due to procedural defects in its adoption. Although this issue was argued in briefs before the trial court, no finding concerning the procedures followed was made or requested by the parties.[18] The absence of such finding cannot, in spite of the arguments of CHPRA and the city, be interpreted as supporting the trial court's decision favorable to either party. We are compelled therefore to remand for a decision by the trial court. We are mindful that if the trial court finds fatal procedural defects that denied the public an opportunity to be heard on the adoption of the charter amendment, our decision on the merits of the controversy could be regarded as advisory or as dictum. We do not so regard it. It is a difficult issue of statutory interpretation of first impression affecting the public interest, presented by parties in vigorous dispute in the best tradition of our adversary system. More important, it is one of inevitable recurrence between the parties, a judicial remedy for which should, we believe, be afforded without additional expense or delay, especially since the possibility of earlier legislative resolution ended with the 1975 legislative session.
Reversed and remanded.
NOTES
[1] Minn.St. 423.37 provides in part: "In each city of the third class the members of its police department may organize a policemen's relief association, or maintain any policemen's relief association existing therein on April 29, 1947. This association shall create, maintain, and administer a policemen's pension fund for the benefit of its members, the widows and children of its members, and the beneficiaries of any policemen's pension or benefit fund in operation on April 29, 1947. All such associations now existing as such corporations, or hereafter incorporated under the laws of this state, shall have perpetual existence."
[2] Minn.St. 423.392 provides in part: "The provisions of section 423.37 shall apply to and bind any city of the third class which by a resolution of its governing body, adopted by a majority of the members thereof shall choose to be bound by it, and such city may thereafter continue to be bound by it notwithstanding a subsequent change in the classification of the city; * * *."
[3] L.1971, c. 407, § 2, subd. 1, applicable to the city of Mankato, provides: "Notwithstanding any provision of general or special law to the contrary, all police officers and fire fighters first employed by the city of Mankato on and after July 1, 1971 shall be members of the public employees police and fire fund [PERA] operated pursuant to Minnesota Statutes, Sections 353.63 to 353.68. Such persons shall not be members of the fire and police relief associations and pension funds of the city of Mankato or be subject to any of the laws relating thereto." Similar legislation regarding police officers of the cities of Anoka and Red Wing has been enacted by the legislature. See, L.1973, cc. 587 (Anoka) and 346 (Red Wing). See, also, L.1974, c. 251, permitting newly hired policemen of the city of New Ulm at their election to be members of PERA. In the city's brief, it is stated: "* * * [T]he City of Columbia Heights has been unable to have a special bill providing for membership [of its newly hired police officers] in P.E.R.A. reach the floor of either house * * *."
[4] Quoted in footnote 2, supra.
[5] The remaining 8 of the 13 cities are covered by special laws modifying the general laws relating to third class cities. E. g., see footnote 3, supra.
[6] See Legislative Retirement Study Commission Reports submitted to the legislature in 1957 and thereafter in 1959, 1961, 1967, 1969, 1971, and 1973. See, also, published articles in Minnesota Municipalities, official publication of the League of Minnesota Municipalities, for December 1964, February 1966, February 1967, September 1968, and especially September 1971 and January 1974.
[7] Minn.St.1974, § 69.79, provided: "Notwithstanding any other provision of law, no pension plan for policemen or paid firemen shall hereafter be established in any municipality by operation of law as a result of change in its population or its conversion from a village to a city. In any such case firemen's and policemen's pension laws previously applicable to the municipality shall remain applicable as if there had been no change in the class or legal status of the municipality."

That statute was repealed by L.1975, c. 405, § 2. L.1975, c. 405, § 1, provides: "Notwithstanding any other provision of law or charter, no city shall, after [August 1, 1975], establish for any of its employees any local pension plan paid for in whole or in part from public funds, other than a volunteer firemen's relief association governed by Minnesota Statutes, Sections 69.771 to 69.776."
[8] Minn.St. 423.373 provides: "Every policeman as herein defined shall automatically become a member of the policemen's relief association of any such city upon the completion of any probationary period required under the laws or ordinances of such city and his appointment as a regular policeman of such city as defined in section 423.372. He shall thereupon become subject to the articles of incorporation and by-laws of such association, and shall be entitled to all of the privileges and benefits therein provided for members of the policemen's relief association of such city."
[9] Section 353.64, subd. 1, provides: "Any person who prior to July 1, 1961, was a member of the police and fire fund, by virtue of being a police officer or fire fighter, shall as long as he remains in either position, be deemed to continue his membership in said fund. Any other employee serving on a full-time basis as a police officer or fire fighter on or after July 1, 1961, shall become a member of the public employees police and fire fund. Any employee serving on less than a full-time basis as a police officer or fire fighter, as determined by the rules prescribed by the board of trustees, shall become a member of the public employees police and fire fund only after a resolution is adopted by the governing body of the governmental subdivision employing such person declaring that the position such person holds is either that of a police officer or fire fighter. Any police officer or fire fighter who by virtue of his employment is required to contribute to any other pension, relief, or retirement fund established for the benefit of officers and employees of a governmental subdivision shall not be a member of this fund."
[10] Section 353.01, subd. 2b(j), repeats this exclusion in these words: "Employees who by virtue of their employment are required to contribute to any other pension, relief or retirement fund established for the benefit of officers and employees of a governmental subdivision, except as an act of the legislature has specifically enabled participation by employees of a designated governmental subdivision in a plan supplemental to the public employees retirement association; * * *."
[11] § 645.16.
[12] Quoted in footnote 2, supra.
[13] To be sure, historically there were relief associations established prior to 1943 by incorporation under general nonprofit corporation laws. These associations raised funds from dues, private sources, and police-sponsored entertainments for the benefit of association members.
[14] Quoted in footnote 10, supra.
[15] Quoted in footnote 9, supra.
[16] Quoted in footnote 7, supra.
[17] § 69.77.
[18] At oral argument we had the impression that the issue was raised as makeweight, with CHPRA anticipating virtual certainty of repassage and voter approval if their position was upheld.